**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| THOMAS PILEGGI, derivatively on behalf of GREENSKY, INC.,<br><br>　　　Plaintiff,<br><br>　　　vs.<br><br>DAVID ZALIK, ROBERT PARTLOW, GERALD BENJAMIN, JOEL BABBIT, JOHN FLYNN, GREGG FREISHTAT, NIGEL MORRIS, and ROBERT SHEFT,<br><br>　　　Defendants,<br><br>　　　and<br><br>GreenSky, Inc.,<br><br>　　　Nominal Defendant. | C.A. No.:<br><br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Thomas Pileggi ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant GreenSky, Inc. ("GreenSky" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants David Zalik, Robert Partlow, Gerald Benjamin, Joel Babbit, John Flynn, Gregg Freishtat, Nigel Morris, and Robert Sheft (collectively, the "Individual Defendants" and together with GreenSky, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Greensky, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*,

the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GreenSky, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by GreenSky's directors, officers, and controlling shareholder from May 25, 2018 through the present (the "Relevant Period") based on misleading statements and omissions made in connection with the Company's Initial Public Offering ("IPO") and the subsequent failure to correct them.

2.     GreenSky is a technology company with its principal offices in Atlanta, Georgia. The Company operates an online platform that allows creditors to process consumer loan applications at the point of sale.   The platform has over 10,000 subscriber businesses.  GreenSky also offers a mobile app that allows consumers to apply for loans in real time while making a purchase.

3.     The Company has two primary revenue streams: (1) "transaction fees" the Company exacts at the time a consumer is approved for a loan via the GreenSky platform; and (2) recurring fees generated from banks over the lifespan of the loans the Company sources. Transaction fees made up roughly 84% of GreenSky's revenues in 2018 and 77% in 2019.

4.     As a holding company, GreenSky has no material assets beyond its significant equity interest GreenSky Holdings, LLC ("GS Holdings"), of which GreenSky serves as the managing member. GreenSky conducts its business through GS Holdings, and through GS

Holdings' subsidiaries, which are operating entities. As the sole managing member of GS Holdings, GreenSky controls all of GS Holdings' operations, and has the right to determine when distributions will be made to holders of GS Holdings units. Common membership units of GS Holdings are referred to as "Holdco Units." Before the Company completed its IPO, GS Holdings held 100% of both the economic interests, management, and voting power of the Company. As such, certain insiders at GreenSky, including most of the Individual Defendants, owned Holdco Units.

5.      Prior to its IPO, GreenSky's "merchant mix," i.e., the assortment of different merchants the Company does business with, was primarily comprised of merchants in the home improvement and solar energy sectors.  The fees the Company charged to solar panel merchants were much higher than those charged to other businesses.  For solar panel merchants, the company charged a 14% transaction fee, whereas for other types of merchants it charged an average transaction fee of 6.5%.

6.      About two years before the IPO, the Company made the risky decision to transition away from solar panel merchants and into the elective healthcare market, for which the Company charges lower than average, and thus less profitable, transaction fees.  The Company's move from the lucrative solar panel business and into elective health care had a negative impact on the Company's financials that was apparent to the Individual Defendants.

7.      In the wake of its decision to move away from solar panel business, solar panel transactions fell from almost 20% of the Company's total business volume in 2016 to 4% by the third fiscal quarter of 2018.  In light of the fact that this significant shift was already underway during the first fiscal quarter of 2018, when the IPO was initiated, the Individual Defendants were

required to include this crucial information in their IPO offering documents, but they failed to do so.

8.     The Company undertook certain changes to its capital structure in connection with the IPO, including designating two classes of stock, Class A common stock, which were publicly sold during the IPO and entitled holders to one vote per share, and Class B common stock, which were not publicly traded and entitled holders to ten votes per share. Generally, holders of both classes of common stock vote together as a single class on all matters submitted to a vote of stockholders. Holdco Unit holders were given various options to trade their units in, including for the same number of Class A shares, or the cash value of that number of shares, set at the current market price. These options provided significant benefits for the Individual Defendants, that included a substantial amount of voting power in the Company, even without significant financial interest in GreenSky. In fact, Defendant David Zalik ("Zalik") alone held nearly 50% of the voting power in the Company, and held over 50% of the voting power in GreenSky as of April 8, 2019.

9.     GreenSky filed a registration statement on Form S-1 with the SEC on April 27, 2018 (the "Registration Statement") in order to pursue its IPO, which was declared effective May 23, 2018. Subsequently, on May 25, 2018, the Company initiated the IPO by filing a prospectus on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. The Registration Statement, the Prospectus, and all amendments thereto are referred to collectively herein as the "IPO Documents."  The Registration Statement also provided that "[t]he owners of the Class B common stock, [this included most of the Individual Defendants], control us and their interests may conflict with yours in the future." The IPO closed on May 29, 2018, and the Company sold over 43.7 million shares, grossing over $1 billion. A substantial amount of these proceeds was used to directly benefit the Individual Defendants, as opposed to the Company.

10.     The IPO Documents made a number of false and misleading statements and omissions of fact necessary to prevent other statements from being misleading.  Specifically, the IPO Documents concealed the impact of the Company's move away from the lucrative solar panel business and simultaneous expansion of its much less profitable elective healthcare business.

11.     In the Registration Statement, the Individual Defendants had a duty to disclose that the Company had been transitioning away from solar panels for the prior two years, and the risks associated with that shift, including the negative financial consequences.  The Individual Defendants were further required to disclose, but failed to disclose, that at the time of the IPO the Company was already facing a significant risk that its decreased average transaction fee rate would have a detrimental effect on the Company's growth prospects, profitability, and earnings before interest, tax, depreciation, and amortization ("EBITDA").

12.     Moreover, prior to and following the IPO, the Individual Defendants caused the Company to spend significant funds, including much of the proceeds from the IPO, on cash distributions to Company insiders, including themselves, on a tax receivable agreement with certain of the Individual Defendants and other pre-IPO investors, and to purchase Holdco Units from the Individual Defendants and other investors. This had the effect of making the Company more dependent on growing its revenue streams, which further heightened the importance of the Company's transaction fee revenue as a metric for investors.

13.     In the months following the IPO, the previously undisclosed facts about the solar panel transaction fees began to come out, with drastic effects on the Company's stock price.  About three months after the IPO, on August 6, 2018, GreenSky stock closed at $21.23 per share.  By August 10, 2018, however, after the Company disclosed the crucial data regarding the deterioration of its transaction fee rate and the negative effect on its financials, the Company's stock price

dropped to $15.59 per share.  On August 13, 2018, the stock price fell again to close at $14.50 per share.

14.     Finally, on November 6, 2018, after the Company released disappointing quarterly financial results, Defendant Zalik revealed on an earnings call that the decline in the Company's transaction fee rate was "entirely driven by our solar mix going from a high of almost 20% of our business . . . to 4% of our business."

15.     On this news, the Company's stock price dropped yet again, from a close of $14.66 on November 5, 2018 to close at $9.28 per share on November 6, 2018, representing a 60% decline from its IPO price of $23.00.  As of January 27, 2020, GreenSky's stock was trading as low as $8.67 per share.

16.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

17.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) at the time of the IPO, GreenSky was transitioning away from its lucrative solar panel loan business, in favor of the much less profitable elective healthcare loan business; (2) this transition involved material risks and resulted in declining transaction fee rates, as a significant percentage of the Company's transaction fees were obtained from its solar panel merchants; (3) the shift in the merchant mix from solar panel to elective health care was already having a negative impact on the Company's revenue and growth prospects; and (4) the Company failed to maintain

internal controls.   As a result of the foregoing, GreenSky's public statements were materially false and misleading at all relevant times.

18.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

19.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

20.     Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to waste its corporate assets by repurchasing its own stock at prices that were artificially inflated due to the foregoing misrepresentations.  Approximately 2,426,198 shares of the Company's common stock were repurchased in connection with the IPO for approximately $55.8 million. As the Company's stock was actually only worth $9.28 per share during that time, the price at closing on November 6, 2018, the Company overpaid by approximately $33.2 million in total. At the same time, the Individual Defendants were engaging in numerous related party transactions to solidify their control and benefit themselves and other Company insiders by millions of dollars, at the expense of the Company.

21.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, certain underwriters, the Company's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Vice Chairman and Chief Administrative Officer ("CAO") and director, four other directors on the Company's current Board of Directors (the "Board"), and one former Company director to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York, as well as a consolidated securities fraud class action lawsuit pending in the Supreme Court of the State of New York,

County of New York (together, the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and is costing the Company millions of dollars.

22.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, six of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the directors' liability in the Securities Class Actions, of their not being disinterested and/or independent directors, of the fact that a majority of the directors are beholden to Defendant Zalik, whose combined voting power is 51.4% as a result of his beneficial stock ownership, rendering him a controlling shareholder, and in light of the fact that all of the Individual Defendants benefitted from, caused, and are liable for the fraudulent schemes alleged herein, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act of 1933 ("Securities Act").

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this District because GreenSky is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of GreenSky. Plaintiff has continuously held GreenSky common stock since before the Relevant Period began.

### Nominal Defendant GreenSky

29.     GreenSky is a Delaware corporation with its principal executive offices at 5565 Glenridge Connector, Suite 700 Atlanta, Georgia 30342. GreenSky's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "GSKY." GreenSky's common stock is divided into publicly traded Class A stock, which confers one vote per share, and non-public Class B stock, which confers ten votes per share.

### Defendant Zalik

30.     Defendant David Zalik co-founded the Company in 2006 and has served as the Company's CEO since 2006.  He has served as the Chairman of the Board of Directors since at least the time of the IPO. According to the Company's Schedule 14A filed with the SEC on April 30, 2019 (the "2019 Proxy Statement), as of April 8, 2019, Defendant Zalik beneficially owned 64,431,899 shares of the Company's Class B common stock, which represented 54.1% of the

Company's outstanding Class B common stock as of that date. Defendant Zalik's beneficial ownership of Class B common stock provides him with a combined voting power of 51.4%, making Defendant Zalik a controlling shareholder.

31.     For the fiscal year ended December 31, 2018, Defendant Zalik received $502,288 in compensation from the Company. This included $500,000 in salary, and $2,288 in all other compensation.

32.     The 2019 Proxy Statement stated the following about Defendant Zalik:

*David Zalik*, age 45, has served as our Chief Executive Officer since co-founding GreenSky in 2006. Prior to co-founding the Company, Mr. Zalik founded MicroTech Information Systems, a computer hardware assembly company, and sold the business in 1996. Mr. Zalik also founded Outweb, a web and mobile-development consulting firm, and formerly was a director of RockBridge Commercial Bank. Mr. Zalik was the recipient of the 2016 Ernst & Young National Financial Services Entrepreneur of the Year Award. We believe Mr. Zalik is qualified to serve in his current capacity as Chief Executive Officer and a director because of his substantial operating, product strategy and industry expertise gained from his previous background as well as his current role as CEO of GreenSky.[1]

**Defendant Partlow**

33.     Defendant Robert Partlow ("Partlow") has served as the Company's Executive Vice President and CFO since 2014.

34.     The 2019 Proxy Statement stated the following about Defendant Partlow:

*Robert Partlow* has served as our Executive Vice President and Chief Financial Officer since 2014. Prior to joining the Company, Mr. Partlow served as Chief Financial Officer and Executive Vice President for Seneca Mortgage Investment LLP, an investor and servicer in residential mortgage servicing. Previously, Mr. Partlow was a Senior Vice President at SunTrust, responsible for managing SunTrust's mortgage loan portfolio and mortgage servicing rights portfolio. Prior to that, Mr. Partlow was the CFO for Fieldstone Investment Corporation, a NYSE traded real estate investment trust ("REIT") that originated and invested in residential mortgages, where he established the REIT's securitization program and led the company's initial public offering. Prior thereto, Mr. Partlow was CFO For Saxon Capital, Inc., Senior Tax Accountant with KPMG and a Senior Assistant

---

[1] Emphasis is in the original unless otherwise noted throughout this Complaint.

Bank Examiner with the Federal Reserve Bank of Richmond. Mr. Partlow received a B.S. in Business Administration from the University of Richmond and a M.S. in Accountancy from the University of Virginia.

**Defendant Benjamin**

35.    Defendant Gerald Benjamin ("Benjamin") has served as the Company's Vice Chairman since 2014, as CAO since February 2018, and as a Company director since at least July 2017.  He is also a member of the Company's Audit Committee.  According to the 2019 Proxy Statement, as of April 8, 2019, Defendant Benjamin beneficially owned 1,074,661 shares of the Company's Class A common stock, which represented 1.7% of the Company's outstanding shares of Class A common stock.  According to the 2019 Proxy Statement, Defendant Benjamin beneficially owned 1,237,563 shares of Class B common stock, which represented 1% of the Company's outstanding shares of Class B common stock.  Given that the price per share of the Company's Class A common stock at the close of trading on April 8, 2019 was $13.38, Benjamin owned approximately $14.3 million worth of Class A common stock.

36.    For the fiscal year ended December 31, 2018, Defendant Benjamin received $5,771,895 in compensation from the Company, including $500,000 in salary, $3,126,793 in stock awards, and $2,195,102 in all other compensation.

37.    The 2019 Proxy Statement stated the following about Defendant Benjamin:

*Gerald Benjamin*, age 61, has served as our Vice Chairman since 2014 and as our Chief Administrative Officer since February 2018. Prior to joining the Company, Mr. Benjamin served as the Managing Partner of Atlanta Equity Investors, a middle market private equity firm; Head of Investment Banking at Navigant Capital Advisors; Senior Managing Director at Casas, Benjamin & White LLC, a national restructuring and mergers and acquisitions advisory firm; and CEO of Premier Healthcare, Inc., a health care services venture development and management company. Mr. Benjamin is a CPA and received a Bachelor of Science degree in accounting from the University of Kentucky, where he was named a Coopers & Lybrand Scholar.

Mr. Benjamin's 35 years of operating, investment banking, corporate finance advisory, principal investing, and restructuring experience qualify him to serve as a member of our Board.

**Defendant Babbit**

38.     Defendant Joel Babbit ("Babbit") has served as a Company director since 2015 and is the Chairman of the Governance and Nominating Committee and a member of the Compensation Committee.  According to the 2019 Proxy Statement, as of April 8, 2019, Defendant Babbit beneficially owned 360,640 shares of Class A common stock and 199,530 shares of Class B Common Stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 8, 2019 was $13.38, Babbit owned over $4.8 million worth of GreenSky Class A common stock.

39.     For the fiscal year ended December 31, 2018, Defendant Babbit received $547,258 in compensation from the Company, which consisted entirely of distributions in respect of GS Holdings equity awards.

40.     The 2019 Proxy Statement stated the following about Defendant Babbit:

*Joel Babbit*, age 65, has served as a member of our Board since 2015. Mr. Babbit is the Co-Founder and Chief Executive Officer of Narrative Content Group, LLC, one of the leading resources for the production and distribution of digital content. Prior to launching Narrative Content Group in 2009, Mr. Babbit spent more than 20 years in the advertising and public relations industry, creating two of the largest advertising agencies in the Southeastern U.S.-Babbit and Reiman (acquired by London-based GGT) and 360 (acquired by WPP Group's Grey Global Group). Following the acquisition of 360 in 2002, he served as President and Chief Creative Officer of the resulting entity, Grey Atlanta, until 2009. He also previously served as President of WPP Group's GCI Group Inc., a public relations firm, and as Executive Vice President and General Manager for the New York office of advertising agency Chiat/Day Inc. Following his hometown of Atlanta being awarded the 1996 Summer Olympics, and at the request of Mayor Maynard Jackson, Mr. Babbit took a leave of absence from the private sector to serve as Chief Marketing and Communications Officer for the City of Atlanta and as a member of the Mayor's cabinet. Mr. Babbit has served on the Board of Directors of Primerica, Inc. (NYSE: PRI) since 2011. He received an A.B.J. degree from The University of Georgia. Mr. Babbit's experience of over 35 years in both traditional

and digital marketing, branding and corporate communications, together with his social media and entrepreneurial experience, qualify him to serve as a member of our Board.

**Defendant Flynn**

41.     Defendant John Flynn ("Flynn") has served as a Company director since April 2018 and is the Chairman of the Audit Committee and a member of the Compensation Committee.

42.     The 2019 Proxy Statement stated the following about Defendant Flynn:

*John Flynn*, age 35, has served as a member of our Board since April 2018. Mr. Flynn is a Principal at TPG, where he is a member of the Internet, Digital Media & Communications group and the Technology group. Mr. Flynn serves on the board of directors of multiple private companies in the technology, digital media and communications industries. Prior to joining TPG in 2015, Mr. Flynn was a Principal at Silver Lake Partners, a private equity firm, where he managed investments in numerous technology, communications, digital media, and internet commerce companies. Mr. Flynn also serves on the board of directors of the San Francisco Zoo and Friends of the Urban Forest, a non-profit organization. Mr. Flynn graduated with honors with a degree in finance and accounting from the Wharton School and a degree in systems engineering from the School of Engineering and Applied Sciences at the University of Pennsylvania. Mr. Flynn's substantial experience in overseeing technology investments for multiple investment firms qualifies him to serve as a member of our Board.

**Defendant Freishtat**

43.     Defendant Gregg Freishtat ("Freishtat") has served as a Company director since 2014 and is a member of the Compensation Committee and the Governance and Nominating Committee.  According to the 2019 Proxy Statement, as of April 8, 2019, Defendant Freishtat beneficially owned 450,816 shares of Class A common stock and 610,850 shares of Class B common stock. Given that the price per share of the Company's Class A common stock at the close of trading on April 8, 2019 was $13.38, Freishtat owned over $6.03 million worth of GreenSky Class A common stock.

44.     For the fiscal year ended December 31, 2018, Defendant Freishtat received $552,469 in compensation from the Company, which consisted of distributions in respect of GS Holdings equity awards.

45.     The 2019 Proxy Statement stated the following about Defendant Freishtat:

*Gregg Freishtat*, age 52, has served as a member of our Board since 2014. In January 2018, Mr. Freishtat co-founded Solar Inventions LLC and has served as its Chief Commercial Officer since that time. From January 2014 to the founding of Solar Inventions, he served as Co-Founder and Chief Executive Officer of SalesWise, Inc. Prior to that, he was the Senior Vice President of Strategic Alliances at Outbrain Inc. Mr. Freishtat is a technology executive with over 20 years of experience leading innovative and transformative companies. He has founded four venture-backed start-ups, all of which had successful exits. Deeply rooted in venture capital and management of internet technology companies, he has led several companies through acquisition and has been involved in developing disruptive technologies in convergence of telecommunications/internet, personal finance/online banking, web-based analytics and digital media/online marketing and relationship intelligence. Mr. Freishtat received an undergraduate degree from Boston University and his J.D. from the University of Maryland Law School. Mr. Freishtat's extensive experience with disruptive technologies and rapidly growing ventures qualify him to serve as a member of our Board.

**<u>Defendant Morris</u>**

46.     Defendant Nigel Morris ("Morris") served as a Company director from 2014 to April 2019.  According to the 2019 Proxy Statement, as of April 8, 2019, Defendant Morris beneficially owned 78,436 shares of the Company's Class A common stock, and 2,191,852 shares of Class B common stock, which represented 1.8% of the total amount of outstanding shares of Class B common stock.  Given that the price per share of the Company's Class A common stock at the close of trading on April 8, 2019 was $13.38, Morris owned approximately $1.05 million worth of Class A common stock.

47.     For the fiscal year ended December 31, 2018, Defendant Morris received $2,041,585 in compensation from the Company, which included $1,538,393 in distributions in

respect of beneficially owned GS Holdings equity awards, and $503,192 in fees in connection with finalizing the Company's August 2017 term loan transaction.

48.     The Company's Form S-1/A filed with the SEC on May 7, 2018, before Defendant Morris's resignation from the Board, stated the following about Defendant Morris:

> *Nigel Morris* has served as a member of our board of directors since 2014. Mr. Morris is the co-founder and managing partner of QED Investors, a direct investment fund focused on high-growth companies that leverage the breakthrough power of data strategies in financial technology. Prior to venture investing, Mr. Morris co-founded Capital One Financial Services in 1994 and served as President and Chief Operating Officer. Mr. Morris received a BSC with honors in Psychology from the East London University and a MBA with distinction from London Business School, where he is also a Fellow. Mr. Morris's financial technology and consumer credit experience qualifies him to serve as a member of our board of directors.

### Defendant Sheft

49.     Defendant Robert Sheft ("Sheft") has served as a Company director since 2014 and is a member of the Audit Committee and the Governance and Nominating Committee.  According to the 2019 Proxy Statement, as of April 8, 2019, Defendant Sheft beneficially owned, along with non-party Jeffrey Gold, 320,788 shares of the Company's Class A common stock, and 22,286,495 shares of Class B common stock, which represented 18.7% of the total amount of outstanding shares of Class B common stock, yielding a combined voting power of 17.8%.  Given that the price per share of the Company's Class A common stock at the close of trading on April 8, 2019 was $13.38, Sheft owned approximately $4.3 million worth of Class A common stock.

50.     The 2019 Proxy Statement stated the following about Defendant Sheft:

> *Robert Sheft*, age 58, has served as a member of our Board since 2014. Mr. Sheft is the Chairman and CEO of Installation Made Easy, Inc. ("IME"), which he acquired in partnership with Roark Capital Group in August 2012. IME develops and coordinates home improvement programs marketed through retailers on a nationwide basis. Mr. Sheft is also a Senior Advisor to Roark Capital Group, a private equity firm based in Atlanta, Georgia. Prior to acquiring IME, Mr. Sheft was the founder, President and CEO of Simply Floored, a residential flooring

company that was acquired by IME. Prior to founding Simply Floored, Mr. Sheft was the founder, President and CEO of RMA Home Services, Inc., which was acquired by The Home Depot in December 2003 to create a platform for its installed home improvement division. Prior to founding RMA, Mr. Sheft spent five years as a Managing Director in charge of merchant Banking at First Southwest. Mr. Sheft began his career as an attorney in the mergers and acquisitions practice of Skadden, Arps, Slate, Meagher & Flom. From May 2011 to February 2019, he served on the Board of Directors of StarTek, Inc. (NYSE: SRT). Mr. Sheft received a B.S. from the University of Pennsylvania's Wharton School and a J.D. from Columbia Law School. Mr. Sheft's extensive home improvement contractor experience qualifies him to serve as a member of our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.     By reason of their positions as officers, directors, controlling shareholders, and/or fiduciaries of GreenSky and because of their ability to control the business and corporate affairs of GreenSky, the Individual Defendants owed GreenSky and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GreenSky in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GreenSky and its shareholders so as to benefit all shareholders equally.

52.     Each director, officer, and controlling shareholder of the Company owes to GreenSky and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholders of GreenSky, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.     To discharge their duties, the officers, directors, and controlling shareholder of GreenSky were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controlling shareholders of GreenSky, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised GreenSky's Board at all relevant times.

56.     As senior executive officers, directors, and/or controlling shareholders of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

57.     To discharge their duties, the officers and directors of GreenSky were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of GreenSky were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to GreenSky's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how GreenSky conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of GreenSky and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GreenSky's operations would comply with all applicable laws and GreenSky's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.     Each of the Individual Defendants further owed to GreenSky and the shareholders the duty of loyalty requiring that each favor GreenSky's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.     At all times relevant hereto, the Individual Defendants were the agents of each other and of GreenSky and were at all times acting within the course and scope of such agency.

60.     Because of their advisory, executive, managerial, directorial, and controlling positions with GreenSky, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GreenSky.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of GreenSky was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GreenSky and was at all times acting within the course and scope of such agency.

## GREENSKY'S CODE OF ETHICS

67.     The Company's Code of Business Conduct and Ethics (the "Code of Ethics") states that "[e]ach director, officer, employee and independent contractor of the Company and of each subsidiary, partnership, venture or other business association that is effectively controlled by the Company, directly or indirectly . . . is responsible for conducting the Company's business in a manner that demonstrates a commitment to the highest standards of ethics and integrity."

68.     The Code of Ethics states that the Company's "core values" consist of the following:

- Integrity;
- Honest and ethical conduct;
- Personal responsibility and accountability for complying with this Code;
- Compliance with laws, rules and regulations;
- Avoidance of conflicts of interest and the appearance of such conflicts;
- Full, fair, accurate and timely disclosure by the Company to the public;
- Proper delegation, guidance and oversight; and
- Prompt internal reporting of violations of this Code.

69.     The Code of Ethics provides that all employees, officers, and directors must comply with all federal and state laws and emphasizes that "making false or misleading disclosures in documents filed with the SEC" is an example of a criminal violation of the law, in addition to

"trading on inside information;" and "stealing, embezzling or misapplying the Company's funds or other assets[.]"

70.     The Code of Ethics further states that all employees, officers, and directors "who participate directly or indirectly, in the preparation of the financial and other disclosure that the Company makes to the public, including in its filings with the SEC or by press release, must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- Act honestly, ethically and with integrity;

- Comply with this Code;

- Endeavor to ensure full, fair, timely, accurate and understandable disclosure;

- If a manager, ensure that employees of the Company understand the Company's obligations to the public under the law with respect to its disclosures, including that results are never more important than compliance with the law;

- Raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- Provide the Company's directors, employees, outside auditors, attorneys, consultants and advisors involved in the preparation of the Company's disclosures to the public with information that is accurate, complete, objective, relevant, timely and understandable;

- Act in good faith, responsibly and with due care, competence and diligence, without misrepresenting material facts or allowing the Covered Person's independent judgment to be subordinated by others;

- Proactively promote honest and ethical behavior among peers in our work environment;

- Achieve proper and responsible use of and control over all Company assets and resources employed by or entrusted to such Covered Person;

- Record or participate in the recording of entries in the Company's books and records that are full and accurate to the best of such person's knowledge; and

- Comply with the Company's disclosure controls and procedures and system of internal controls.

71. The Code of Ethics also maintains that GreenSky expects directors and officers to "not discharge his or her Company duties and responsibilities under circumstances that could discredit the Company, unduly cause unfavorable criticism of the Company or impair public confidence in the Company's integrity." Moreover, officers and directors (among others at the Company) may not "take unfair advantage of anyone through manipulation, misrepresentation, inappropriate threats, fraud, abuse of confidential information or other similar unethical or improper conduct."

72. The Code of Ethics provides, with respect to violations thereof, that those subject to the Code of Ethics "must immediately report the actual or suspected violation to a Compliance Officer, the Chairperson of the Committee or the Board, as appropriate, and must cooperate in any investigation of any actual or suspected violation of this Code."

73. The Code of Ethics further provides that "[t]he Company's Board of Directors . . . is ultimately responsible for the implementation of this Code."

74. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

75.     GreenSky is a U.S.-based technology company that operates an online platform that allows merchants to process consumer-loan applications at the point of sale for the purchase of various types of goods and services.  Consumers can apply for a loan via GreenSky's mobile application ("app"), which connects the loan application to one of GreenSky's bank partners for processing.

76.     As of March 2018, over 12,000 businesses were using GreenSky's platform, which included health providers, home improvement stores such as Home Depot, and individual home improvement contractors.  The Company traditionally catered to home improvement prior to its IPO, and particularly from solar panel merchants.  In 2016, the Company had more than 7,000 active merchants in home improvement utilizing its loans through GreenSky's app.  Approximately 1.7 million consumers have used the app, resulting in $12 billion in transaction fee revenues since GreenSky's founding.

77.     The Company has two primary revenue streams, "transaction fees" and "servicing fees."  GreenSky collects a transaction fee at the time a consumer is approved for a loan through the Company's application.  These transaction fees make up the vast majority of the Company's revenue, accounting for about 86% of its total revenue in 2017.  The amount of the transaction fee is variable from merchant to merchant, and according to the terms of the loan chosen by the consumer.  The Company also collects servicing fees from banks on a periodic basis over the course of the loans it sources.

78.     GreenSky is the sole managing member of GS Holdings, and possessed a 30% equity interest in GS Holdings as of December 31, 2018.  GS Holdings is a holding company with controlling interests in a number of operating subsidiaries, through which GreenSky conducts its

business.  GreenSky operates and controls all of GS Holdings' operations, and it has the right to determine when distributions of Holdco Units will be made to GS Holdings unitholders.

79.     Before the Company's IPO, a significant segment of the Company's revenue stemmed from solar panel merchants, which made up approximately 20% of the Company's transaction business.  The Company focused on solar panel merchants because these transactions were highly profitable, especially when compared to profits realized from transactions with other types of merchants.  Indeed, the average transaction fee for solar panel purchases is about 14%, more than twice the average transaction fee for other merchants, which averaged approximately 6.5%.  Both of these average rates were consistent for the time period of at least four, and as many as seven, years, before the IPO.  Due to its lucrative potential, the Company's senior management often encouraged its sales representatives to pursue solar panel merchants as customers before the middle of 2016, which provided a win-win for salespeople who could obtain higher commission on the higher transaction fees.

80.     In or around 2016, about two years before the 2018 IPO, the Company began to transition away from solar panel transactions, as a result of perceived uncertainty in the solar panel industry.   At the Company's direction, Company salespeople rejected a large number of applications from new solar merchants, applied a more stringent underwriting procedure to the few new solar panel loan applications that the Company did accept, and began ending the Company's existing agreements with solar panel sellers.  As of 2017, all solar panel sellers were handled by just one salesperson at GreenSky.

81.     The Company's sharp turn away from solar panels caused its solar panel transactions to plummet from almost 20% of its total business in 2016 to 12% of its total business

in 2017, and to just 8% of its total business in the first quarter of 2018.  By the second quarter of 2018, solar panel transactions made up 5% of the Company's total business.

82.     While the Company was transitioning away from solar panels, it was also transitioning to, and enlarging, its business in the elective healthcare industry, which had an average transaction fee rate of 6.5%, less than half the 14% solar panel transaction fee rate.  Not only were the transaction fee rates smaller, but the loans themselves were for smaller amounts.  As a result, the Company's average transaction fee rate decreased from 7.9% in 2016, to 7.44% in 2017, and then to 6.9% in the first quarter of 2018, before the IPO.

**The Individual Defendants' Control Over GreenSky**

83.     Before the IPO, the Individual Defendants undertook a series of maneuvers in order to ensure they extracted monies from, and asserted control over, the Company before, during, and after the IPO.

84.     Prior to the IPO, the Individual Defendants caused the Company to pay special cash distributions to themselves, their associates, and other owners of GreenSky.  During 2017, the Company declared non-tax distributions of $346.5 million to certain equity holders and a related party in connection with the execution of a term loan.  Then, in December 2017, GreenSky declared a $160 million special cash distribution to GS Holdings unit holders and holders of profit interests, funded by a sale of loan receivables and cash from operations.  In May 2018, immediately prior to the IPO, the Company declared a $26.2 million special operating distribution to its shareholders.  As a result of these distributions, Defendant Sheft took in almost $89 million, Defendant Morris more than $5.5 million, and Defendant Benjamin over $2.3 million in tax and special distributions.

85.     Additionally, on May 23, 2018, shortly before the IPO, the Individual Defendants caused the Company to execute a tax receivable agreement (the "Tax Receivable Agreement") that handsomely rewarded the Individual Defendants.  The Tax Receivable Agreement dictates that Defendants Zalik, Benjamin, Babbit, Freishtat, and Sheft, as well as certain of their affiliates and other investors who predated the IPO, would receive roughly 85% of the tax savings amount, if any, that GreenSky realizes as a result of certain reorganization transactions before the IPO.  The Prospectus estimated that over the course of 15 years following the IPO, the Company will have to pay about $928 million in payments to the beneficiaries of the Tax Receivable Agreement. Pursuant to the Tax Receivable Agreement, even if the agreement is terminated, the Company would still be obligated to pay out approximately $556 million to Defendants Zalik, Benjamin, Babbit, Freishtat, Sheft, and certain other pre-IPO investors.

86.     In tandem with the IPO, the Individual Defendants altered the Company's capital structure to lock in place their voting control over GreenSky.  Specifically, the Individual Defendants implemented the two-class share structure consisting of Class A common stock, which is publicly traded and provides the holder one vote per share, and Class B common stock, which is not publicly traded, and provides the holder with ten votes per share.

87.     Owners of the Company's pre-IPO Holdco Units, which included nearly all of the Individual Defendants, were allowed to exchange their Holdco Units for an equal number of Class B shares, if they also provided a *de minimis* fee of $0.001 per Class B share, an equal number of Class A shares, or the cash value of an equivalent number of Class A shares.

88.     Immediately after the IPO, Class B shareholders, including Defendants Zalik, Sheft, Babbit, Benjamin, Freishtat, and Morris, controlled 95.8% of the Company's voting power, despite that they held only a minority economic stake.  Defendant Zalik, by himself, held 48.6%

voting power (currently 51.4%), while Defendant Sheft (with his investment partner, non-party Jeffrey Gold) held 15.6% of the Company's voting power.  Investors in the IPO held 3.2% of the Company's share voting power, and former corporate investors held the remaining 1% of voting power.

89.     The Prospectus characterized the Class B shareholders as being able to "strongly influence or effectively control [the Company's] decisions" by way of their control over most of the Company's combined voting power.  The Prospectus further admits that the Class B shareholders "will be able to control the election and removal of directors and thereby determine [the Company's] corporate and management policies, including potential mergers or acquisitions, payment of dividends, asset sales, amendment of our certificate of incorporation and bylaws and other significant corporate transactions."

90.     Moreover, the Individual Defendants directed that a majority of the proceeds from the IPO be used to purchase Holdco Units from almost every Individual Defendant.  In connection with this transaction, Defendant Zalik reaped $468 million in IPO proceeds, Defendant Sheft reaped $105 million, Defendant Morris $11 million, Defendant Benjamin $8 million, Defendants Partlow and Freishtat each over $2 million, and Defendant Babbit over $1 million in proceeds. These transactions are illustrated in the following chart that is in the Prospectus:

| Name of Beneficial Owner[1] | Number of Holdco Units or Shares of Class A common stock redeemed by us | Aggregate purchase price($) |
|---|---|---|
| *5% Stockholders* | | |
| David Zalik | 21,423,808 | $ 468,110,205 |
| Robert Sheft and Jeffrey Gold | 4,844,890 | $ 105,860,847 |
| TPG Funds | 2,404,668 | $ 52,541,996 |
| | | |
| *Executive Officers and Directors (other than those already listed above)* | | |
| Gerald Benjamin | 401,372 | $ 8,769,978 |

| | | |
|---|---|---|
| Chris Forshay | 26,783 | $ 585,209 |
| Steven Fox | 53,839 | $ 1,176,382 |
| Tim Kaliban | 603,046 | $ 13,176,555 |
| Dennis Kelly | 87,964 | $ 1,922,013 |
| Alan Mustacchi | 35,891 | $ 784,218 |
| Robert Partlow | 106,379 | $ 2,324,381 |
| Lois Rickard | 40,181 | $ 877,955 |
| Joel Babbit | 77,323 | $ 1,689,508 |
| Gregg Freishtat | 98,587 | $ 2,154,126 |
| Nigel Morris | 523,405 | $ 11,436,399 |
| *Other Employees and Former Employees* | 3,191,329 | $ 69,730,539 |
| *Other Investors* | 4,080,535 | $ 89,159,689 |

91.     Because much of the proceeds from the IPO were used to purchase Holdco Units from the Individual Defendants and other investors, rather than being used to fund Company operations, the Company's dependence on growing its revenue was especially vital, including the Company's transaction fee revenue.

**The Individual Defendants' Duty to Disclose**

92.     SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that all Registration Statements:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. 229.303.

93.     Instruction 3 to paragraph 303(a) requires that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  17 C.F.R. § 229.303(a), Instruction 3.

94.     The SEC's interpretive release regarding Item 303 provides that Regulation S-K imposes a duty to disclose "where a trend, demand commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations." *Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 6835, Exchange Act Release No. 26831, Investment Company Act Release No. 16961, 43 SEC Docket 1330 (May 18, 1989).

95.     As outlined herein, the Individual Defendants admit they knew that the removal of the solar business had a substantial likelihood of having a severely negative impact on the Company's average transaction fee rate and profitability, and in fact was already having a negative impact on the Company's financials.  At the time of the filing of the Registration Statement, these trends were either well-known or could have easily been ascertained through reasonable investigation, yet the Individual Defendants failed to disclose them in the Registration Statement.

**False and Misleading Statements**

***The IPO Documents***

96.     On or about April 27, 2018, GreenSky filed with the SEC the Registration Statement, which was signed by Defendants Zalik, Partlow, Babbit, Benjamin, Flynn, Freishtat, Morris, and Sheft.  The final version of the Prospectus was filed on May 25, 2018.  The Company's IPO closed on May 29, 2018, and the Company sold 43.7 million shares of Class A common stock to the public at $23.00 per share, grossing more than $1 billion.

97.     The IPO Documents made a number of false and misleading statements regarding the Company, its management, operations, financial performance, growth prospects, and the relevant market.  Such statements were designed to bolster investor confidence in GreenSky's sales

and market position at the time of the IPO, while failing to disclose the disproportionate impact of solar panel transaction fee rates on the Company's overall transaction fee rates.

98.    For example, even though GreenSky had been reducing its solar panel transaction business since mid-2016, about two years before the May 2018 IPO, the only citation to that strategic move in the Prospectus is as follows:

> Attractive Unit Economics
>
> Our low-cost go to market strategy, combined with our visible and recurring revenue model, provides for a fast payback period and strong dollar-based retention:
>
> * * *
>
> Strong dollar-based retention. We measure "dollar-based retention" on an annual cohort basis and define a cohort as the merchants that enroll for the first time on our platform within a given year. Our dollar-based retention calculation is adjusted to exclude Home Depot, which we count as a single merchant despite it having approximately 2,000 locations, and **to exclude solar panel merchants, as we actively reduced our transaction volume with such merchants in 2017**. "Dollar-based retention" refers to the transaction volume generated during a given year by each cohort of merchants relative to the transaction volume generated by that same merchant cohort in the prior year, and the calculation is adjusted for a two quarter seasoning period. Our dollar-based retention has exceeded 100% on our platform for each annual cohort in the past three years.

(Emphasis added.)

99.    The Prospectus further concealed the effect that the reduction in solar business was having on GreenSky's transaction fee rates in its summary of the prior year's financial performance.  For example, the Prospectus compares total revenue from 2018 to 2017 in the following manner:

> Total revenue increased $20.0 million, or 31%, in the first three months of 2018 compared to the same period in 2017. The increase was primarily due to the net effect of a 29% increase in transaction fees, from $54.9 million in the first three months of 2017 to $70.9 million in the first three months of 2018. The increase in transaction fees was driven by a 47% increase in transaction volume. **The impact of higher transaction volume was offset by a decrease in transaction fees earned**

*per dollar originated from 7.79% in the first three months of 2017 to 6.87% in the same period in 2018. Transaction fee rates vary based on the financing terms selected by consumers at the point of sale and, in general, loans with higher annual percentage yields carry lower transaction fee rates. In the first three months of 2018, relative to the same period in 2017, we facilitated a larger volume of loans with higher annual percentage yields, resulting in the decrease in transaction fees earned per dollar originated.* The impact of higher transaction volume was further offset by promotional pricing we offered to certain merchants during the first three months of 2018, which reduced transaction fees by $2.4 million.

(Emphasis added.)

100.    The Prospectus made similarly false and misleading statements when it compared

revenue in 2017 over 2016:

*2017 Compared to 2016.* Total revenue increased $62.0 million, or 24%, in 2017 compared to 2016. The increase was primarily due to a 22% increase in transaction fees from $228.4 million in 2016 to $279.0 million in 2017. The increase in transaction fees was driven by a 31% increase in transaction volume. ***The impact of higher transaction volume was offset by a decrease in transaction fees earned per dollar originated from 7.93% in 2016 to 7.40% in 2017. Transaction fee rates vary based on the financing terms selected by consumers at the point of sale and, in general, loans with higher annual percentage yields carry lower transaction fee rates. In 2017, relative to 2016, we facilitated a larger volume of loans with higher annual percentage yields, resulting in the decrease in transaction fees earned per dollar originated.***

(Emphasis added.)

101.    The Prospectus also ignored the impact of merchant mix on the Company's

transaction fee revenue when explaining the logistics of its transaction fees:

We earn a specified transaction fee in connection with purchases made by borrowers that are financed by our Bank Partners. The transaction fee is a one-time fee payable by the merchant that ***includes a merchant fee component and an interchange fee component . . . . The merchant fee is calculated by multiplying a set fee percentage (as outlined in a schedule provided to the merchants)*** *by the dollar amount of a loan at the point of origination.* ***As merchant fees are billed to, and collected directly from, the merchant at least monthly, the transaction volume is known and there is no unresolved variable consideration as of the end of a quarterly reporting period.*** We recognize revenue at the point of sale by applying the expected value method, wherein we assign 100% probability to the transaction price as calculated using actual transaction volume. . . . The value of

our service transferred to the merchants is represented by the merchant fee rate, *as agreed upon at contract inception*.

(Emphasis added.)

102.    The IPO Documents provided a general description of the Company's transaction fee revenue, which represented that the transaction fee revenue was "strong" and "recurring," as follows:

> We have a strong recurring revenue model built upon repeat and growing usage by merchants. We derive most of our revenue and profitability from upfront transaction fees that merchants pay us every time they facilitate a transaction using our platform. Thus, our profitability is strongly correlated with merchant transaction volume. The transaction fee rate depends on the terms of financing selected by a consumer.

103.    The Company repeated the false and misleading statement that the transaction fee revenues are "stable" and "recurring" throughout the Prospectus, as follows:

> Although we offer our technology at no upfront cost, *we monetize through an upfront transaction fee every time a merchant receives a payment using our platform. This creates stable, recurring revenues,* aligns our incentives with the interests of our merchants, and enables us to grow along with our ecosystem. In 2017, 93% of our transaction volume was generated from merchants that were enrolled on our technology platform as of December 31, 2016. In addition, our Bank Partners pay us a recurring servicing fee over the lives of their loans.

(Emphasis added.)

104.    The Prospectus consistently failed to disclose the effect of merchant mix on transaction fees in detailing how transaction fees are calculated:

> *Transaction fees*. *We earn a specified transaction fee in connection with each purchase made by a consumer based on a loan's terms and promotional features.* Transaction fees are billed to, and collected directly from, the merchant and are considered to be earned at the time of the merchant's transaction with the consumer. We also may earn a specified interchange fee in connection with purchases where payments are processed through a credit card payment network. Transaction fees constitute the majority of our total revenues, accounting for approximately *83% of our total revenues for the three months ended March 31, 2018.*

(Emphasis added.)

105.    The Prospectus further failed to explain the significance of merchant mix to the

Company's transaction fee revenue in discussing growth trends:

> Growth in Active Merchants and Transaction Volume. ***Growth trends in active merchants and transaction volume are critical variables directly affecting our revenue and financial results. Both factors influence the number of loans funded on our platform and, therefore, the fees that we earn and the per unit cost of the services that we provide.*** Growth in active merchants and transaction volume will depend on our ability to retain our existing platform participants, add new participants and expand to new industry verticals. To support our efforts to increase our network of merchants, we expanded our sales and marketing groups, which focus on merchant acquisition, from 37 full-time-equivalents as of December 31, 2015 to 120 as of March 31, 2018.

(Emphasis added.)

106.    The Prospectus also made multiple references to the Company's shift toward the

elective healthcare industry, deceptively characterizing the shift as a growth opportunity:

> *Our Existing Markets—Home Improvement and Elective Healthcare—are Sizeable and Growing*
>
> The home improvement market is large, fragmented and growing, representing approximately $315 billion in spending volume in 2017, according to the Joint Center for Housing Studies of Harvard University, although not all home improvement projects are of a size suitable for financing. Merchants in this market range from small, owner-operated contractors to large national brands and retailers. From our inception through March 31, 2018, our Bank Partners have used our program to extend over $12 billion of financing, primarily including loans for home improvement sales and projects involving, among other things, windows, doors, roofing and siding; kitchen and bath remodeling; and heating, ventilation and air conditioning units. We believe that spending on home improvement goods and services will continue to increase as the national housing stock ages and existing home sales increase.
>
> In 2016, we began expanding into elective healthcare, which, like the home improvement market, is a large, fragmented market featuring creditworthy consumers who tend to make large-ticket purchases. ***We believe the elective healthcare market rivals in size the home improvement market in terms of annual spending volume, based on the number and cost of annual procedures performed.***

Elective healthcare providers include doctors, dentists, outpatient surgery centers and clinics providing orthodontics, cosmetic and aesthetic dentistry, vision correction, bariatric surgery, cosmetic surgery, hair replacement, reproductive medicine, veterinary medicine and hearing aid devices. We believe that because of population aging, innovations in medical technology and ongoing healthcare cost inflation, we are well-positioned to increase volume in the growing elective healthcare industry vertical.

* * *

### *Expand into New Industry Verticals, Including Online Retail and Traditional Store-Based Merchants*

***We recently expanded into the elective healthcare industry vertical and intend to explore other large, fragmented markets with creditworthy consumers who tend to make large-ticket purchases online and in-store.*** For example, online retail represents an attractive and low cost acquisition channel ripe for penetration that fits synergistically with our existing point-of-sale mobile platform. In 2017, domestic retail sales through the e-commerce platform exceeded $453 billion, growing by almost 16% over the prior year according to the U.S. Census Bureau. The consumer credit and payments industry in the online retail market is highly competitive. In the online retail market, we would expect to face competition from a diverse landscape of consumer lenders, including credit card issuers, traditional banks and new technology-centric payment tools. In addition, efforts by us and our merchants to promote use of the GreenSky program in the online retail market may not be as effective as promotion in-person at the point of sale. We also may face greater fraud-related risk, which generally is low in our traditional in-person model.

We expect to seek out additional attractive industry verticals (whether online or in-store) based on our ability to efficiently go to market, grow market share, generate attractive risk-adjusted yields for our Bank Partners and continue to maximize value for our constituents.

* * *

***In addition to the home improvement market, we recently entered the elective healthcare industry vertical****,* where our technology platform facilitates the offering of payments and financing solutions to patients of healthcare providers, from small solo and multi-provider practices to large national provider groups. We had 921 active merchants in the elective healthcare industry vertical as of December 31, 2017, which grew to 1,472 as of March 31, 2018.

(Emphasis added.)

107.    The Prospectus further deceptively emphasized the Company's growth and "significant market opportunity" as follows:

> *We have achieved significant growth in active merchants, transaction volume, total revenue, net income and Adjusted EBITDA.* Our low-cost go-to-market strategy, coupled with our recurring revenue model, has helped us generate strong margins. *Transaction volume (which we define as the dollar value of loans facilitated on our platform during a given period) was $3.8 billion in 2017, representing an increase of 31% from $2.9 billion in 2016. Further, transaction volume was $1.0 billion in the three months ended March 31, 2018, representing an increase of 47% from $0.7 billion in the three months ended March 31, 2017.* Active merchants (which we define as home improvement merchants and healthcare providers that have submitted at least one consumer application during the 12 months ended at the date of measurement) totaled 12,231 as of March 31, 2018, representing an increase of 52% from 8,048 as of March 31, 2017. *Our total revenue grew 23% from $264 million in 2016 to $326 million in 2017, net income grew 12% from $124 million in 2016 to $139 million in 2017, and Adjusted EBITDA grew 21% from $131 million in 2016 to $159 million in 2017.* For the period ended March 31, 2018, total revenue was $85 million, net income was $19 million and Adjusted EBITDA was $27 million.

* * *

> *Our market opportunity is significant.* In 2017, there was approximately $315 billion of spending volume in the home improvement market, which historically has represented substantially all of our transaction volume, *and substantial opportunities in the elective healthcare market, which we entered in 2016.* In addition, at year end 2017, according to the Federal Reserve System, there was approximately $3.8 trillion of U.S. consumer credit outstanding across a fragmented landscape of lenders, providing a significant opportunity for us to extend our platform to other markets where transactions are financed at the point of sale.

* * *

> **Our Growth Opportunities**
> We have significant opportunities to expand our business. Our growth strategy focuses on the following efforts to continue to deliver value for our constituents and expand our ecosystem.

(Emphasis added.)

108.     Lastly, the Prospectus omitted the fact that certain risks it warned about had already come to pass, and were already having a negative impact on the Company's financials, in stating the following:

> There is significant competition for our existing merchants. ***If we fail to retain any of our larger merchants or a substantial number of our smaller merchants, and we do not acquire new merchants of similar size and profitability, it would have a material adverse effect on our business and future growth. We have experienced some turnover in our merchants, as well as varying activation rates and volatility in usage of the GreenSky program by our merchants, and this may continue or even increase in the future***. Program agreements generally are terminable by merchants at any time. Also, we generally do not have exclusive arrangements with our merchants, and they are free to use our competitors' programs at any time and without notice to us. If a significant number of our existing merchants were to use other competing programs, thereby reducing their use of our program, it would have a material adverse effect on our business and results of operations.

(Emphasis added.)

109.     The foregoing statements made in the IPO Documents were materially false and misleading because they failed to disclose, *inter alia*, that: (1) at the time of the IPO, GreenSky was transitioning away from its lucrative solar panel loan business, in favor of the much less profitable elective healthcare loan business; (2) this transition involved material risks and resulted in declining transaction fee rates, as a significant percentage of the Company's transaction fees were obtained from its solar panel merchants; (3) the shift in the merchant mix from solar panel to elective health care was already having a negative impact on the Company's revenue and growth prospects; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, GreenSky's public statements were materially false and misleading at all relevant times.

### The Truth Gradually Emerges

### *August 7, 2018 Press Release and Earnings Call*

110. On August 7, 2018, the Company issued a press release disclosing its financial results for the fiscal quarter ended June 30, 2018.  The press release announced that the Company had earned transaction fees of $90.2 million on transaction volume of $1.32 billion during the quarter, and it stated that the Company's transaction fee rate was approximately 53 basis points *lower* than the transaction fee rate during the second quarter of 2017.

111. Additionally, the press release gave guidance for the 2018 fiscal year, predicting that transaction volume would reach anywhere from $5.1 to $5.3 billion, revenue would hit $433 to $445 million, and adjusted EBITDA would reach $192 to $199 million, a 20 to 25% increase from the prior year.

112. On the same day, the Company held an earnings call, during which Defendant Zalik admitted that the decline in transaction fee rate was caused by the shift from solar panel merchants to elective healthcare companies.  When an analyst asked Defendant Zalik why the transaction fee rate had "ticked down . . . sequentially," Zalik replied, "Yeah, so that's mix shift," further explaining later in the call that "particularly as we have de-volumed in solar, the average transaction fee or take rate has gotten to a stable place."  In fact, the average transaction fee had "stabilized" at a point far below the rates the Company promoted in its Registration Statement and Prospectus.

113. Defendant Benjamin stated during the same call that the Company was also adding new accounts in the HVAC industry, stating that the industry "comes with a little bit more modest transaction fee."

***August 10, 2018 10-Q***

114.   On August 10, 2018, the Company filed with the SEC its quarterly report for the fiscal quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Zalik and Partlow.  Defendants Zalik and Partlow signed certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

115.   The 2Q18 10-Q disclosed that "[t]he impact of higher transaction volume was offset by a decrease in transaction fees earned per dollar," and it acknowledged, for the first time that "[t]he mix of loans offered by merchants generally varies by merchant category.  Therefore, as the mix of merchants evolves over time, the mix of loans will evolve accordingly."

116.   On these disclosures, the price of the Company's stock fell precipitously.  On August 6, 2018, the day before GreenSky announced its second quarter numbers, the stock closed at $21.23 per share.  By August 10, 2018, the stock shed 26% of its value, closing at $15.59 per share, and fell further to close at $14.50 per share on August 13, 2018.

117.   The foregoing disclosures, released fewer than three months after the IPO, emphasize that the Company could have advised investors that the transition from solar merchants had already, before the IPO, caused a deterioration in the Company's average transaction fee rates, that the deterioration would continue, and further that there was a substantial likelihood that the Company would be unable to offset the declining average transaction fee rate with a higher volume of loans with other types of merchants, thereby having a negative effect on the Company's financials.

**The Truth Fully Emerges**

***November 6, 2018 Press Release and Earnings Call***

118.     On November 6, 2018, GreenSky issued a press release disclosing poor financial results for the third quarter of 2018.  The press release stated that GreenSky generated $96.7 million in transaction fees on $1.41 billion in transaction volume, reflecting that the Company's transaction fee rate was 35 basis points lower than the transaction fee rate that was realized in the third quarter of 2017.  The press release also announced that GreenSky had significantly revised its financial guidance for the 2018 fiscal year.

119.     Specifically, the Company revised its estimated EBITDA downward to a range of $165 million to $175 million, reflecting between 4 and 10% growth, a far cry from the 21% growth rate GreenSky realized between 2016 and 2017, as promoted in the IPO Documents, and well below the 20 to 25% growth rate the Company had predicted three months before.

120.     During a call held the same day to discuss the Company's earnings, Defendant Zalik revealed, at last, that the Company's continually disappointing results since the IPO were wholly due to the Company's shift away from the solar panel business, stating the following:

> [GreenSky's] **average transaction fee take rate year-over-year is down 70 basis points, entirely driven by our solar mix going from a high of almost 20% of our business in '17 [sic] to 4% of our business**. And just to remind you, our solar business had an average take rate of 14—nearly 14%. So you take nearly 20% of your business at a 14% and drop it to 4% and replace it with 7%, you can see what the impact is.

(Emphasis added.)

121.     During the same call, Defendant Partlow corroborated Defendant Zalik's statements, stating, "[c]ompared to the third quarter of last year, transaction fee rate decreased to 6.91% compared to 7.2%—7% in the third quarter of last year as a mix of high transaction fee solar business decreased from 12% to just 4% of originations this quarter."

122.     Defendant Zalik further stated, "we had a 70 basis point headwind because we slowed down solar from nearly 20% of our business to 4%. There's no other piece of our business that would have that impact."

123.     On this news, the price of the Company's stock dropped once more, from $14.66 per share at the close of trading on November 5, 2018 to $9.28 per share at close on November 6, 2018.

124.     Analysts also reacted with dismay to these disclosures. For instance, J.P. Morgan's North America Equity Research division stated that "the reduction was a surprise," and "[GreenSky] faces a tough road to restore credibility." Similarly, Compass Point reduced its estimates for the Company's share price target, and stated, "[w]e were admittedly surprised at how significant the guidance revisions were."

**Subsequent Disclosures**

125.     Over the course of the next several months, the Individual Defendants made a number of additional statements to the market that further highlighted the magnitude of the false and misleading statements and omissions in the IPO Documents.

***November 9, 2018 10-Q***

126.     On November 9, 2018, the Company filed with the SEC its quarterly report for the fiscal quarter ended September 30, 2018 on Form 10-Q (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Zalik and Partlow, who also signed SOX certifications, attesting to the accuracy of the 3Q18 10-Q.

127.     The 3Q18 10-Q further admitted that the transition from solar panels had negatively impacted the Company's financials, stating:

> The impact of higher transaction volume was offset by a decrease in transaction
> fees earned per dollar originated from 7.26% during the three months ended

September 30, 2017 to 6.91% during the same period in 2018. Similarly, transaction fees earned per dollar originated declined from 7.44% during the nine months ended September 30, 2017 to 6.88% during the same period in 2018.

128.    The 3Q18 10-Q also reiterated that the shift in merchant mix had affected the Company's transaction fees, and that it would continue to do so.

***November 12, 2018 Conference Call***

129.    On November 12, 2018 the Company participated in a call as part of the JPMorgan Ultimate Services Investor Conference. During the call, Defendant Zalik acknowledged that the Company's 2018 guidance had been revised downward due to the transition away from solar panel merchants. He went on to state that the Company was aware of the impact the shift from solar panel merchants was having on the Company's bottom line "going into 2018," which is to say, months before the IPO.

130.    Defendant Zalik stated:

So fundamentally, we thought that our average take rate in 2018 was going to be the same as our take rate in 2017. ***We knew going into 2018 that historically, outside of our solar business, our average take rate had been incredibly stable for years. We knew that we had made a decision at the end of 2016 to reduce our concentration on solar. We knew that solar had an outsized average take rate of 14%. And as solar as a percentage of our business was coming down that our average take rate would go down.*** What we believe was that we were taking solar from a high in Q1 of '14—of '17, 15%. Then we saw stability at 8%—or 12%, 3 quarters in a row. We thought that in '18, it would get stable at 8%. It actually went down below 4%. So the first thing we got wrong throughout 2018 is that we thought solar would come down. We did not think it would come down as far as it did. ***That changes the average take rate in '18***. The second thing that we got wrong was we knew that rates were going up. Rates going up are neutral for us and—generally, and what we've shown is that as rates have gone up year-over-year, the average APR of our origination portfolio has gone up 177 basis points. Take rate flat, average APR portfolio gone up 177 basis points, bank margin has gone up a fraction of that. The delta makes up the 50 basis points less take rate. But the second thing we got wrong is historically when we raised rates on products to merchants, the merchants just paid 10, 20, 30 basis points more. But interest rates over the last year have gone up so dramatically, we didn't have to raise rates 10 or 20 basis points. We had to raise rates—ease to the merchants 100 basis points, 150 basis points. The merchants took that as an opportunity to say, "Instead of paying 7% last year

to give my customer a 5.99% APR product, I'm not going to pay 8.5% to give them the same 5.99% product. I'm going to still pay 7%, let them have a 6.99% product." So we got no benefit in the average take rate from raising rates. We got benefit in average APR. ***So the big picture or first thing we got wrong was we did not believe that solar would go from well over 15% to well under 4%.*** We saw it stable at 12% for all of '17, so that's the big picture. But if you fast forward to August, we knew that solar had come down. We knew that it was coming down more than we thought it would, but we also had lots of rate increases. We did not see though that the merchants were going to be picking exclusively neutral to them and passing it all onto the consumer. So that's the fundamental.

(Emphasis added.)

131.    Defendant Zalik went on to address the recently disclosed fact that the Company would miss its 2018 earnings predictions by $100 million, claiming that the Company was not prepared for the fast rate at which the solar panel business was reduced, and its inability to offset the reduction with other revenue streams:

So first thing we got wrong was we didn't think solar was going to go down as deeply and as fast. Second thing is we thought we were going to get offsetting benefit. . . . Now we missed—we'll miss by $100 million, $100 million relative to going from $3.8 billion to $5.2 billion. It's going to be $5.1 billion. ***I'm going to do a mea culpa about take rate, about solar, about raising rates, offsetting the lower take rate.*** I'm not feeling terrible about $3.8 billion to $5.1billion. That— arguably that miss is arguably a function of solar went down by more than $100 million more than we expected; in terms of the core business, ***everything else was exactly as we expected from a volume standpoint.***

(Emphasis added.)

132.    The foregoing illustrates that before the IPO, the Individual Defendants knew that they caused the Company to engage in a strategy to significantly scale back its highly profitable solar panel business.  Further, the Individual Defendants knew the effect that the reduction of the solar panel business would have on the Company's financials.

### *November 27, 2018 Conference Call*

133.    On November 27, 2018, the Company participated in a conference call held in connection with the Credit Suisse Technology, Media & Telecom Conference.  Questioned about

the lower-than-expected average transaction fee in the second and third quarters, Defendant

Benjamin stated:

> ***This is all driven by mix.*** We were very determined and it's been well chronicled, we made the decision at the end of 2016 to radically cull our home improvement business. We were concerned about the level of consumer satisfaction and really the value proposition in that vertical. And we took it down from what was approaching 20% of our annual originations down to a number that was single digits. And we took it down to basically 2 handfuls of merchants where the customer satisfaction rate was outstanding. . .
>
> We expected that business to go down from, as I said, approaching 20% to about 8%. It actually went down a little quicker than expected and actually dropped below 5% to 4%. And candidly, that difference in solar dropping from 8% to 4% and that business came with a 14% transaction fee. ***So when we made the decision to cull that business, it was with full acknowledgment and realization that it was highly profitable business with an upfront transaction fee of 140 basis points. But that delta, watching the solar business drop a little quicker than we thought, really gave rise to the shortfall. So we have basically 50 basis point variance in transaction fee, based on that solar penetration dropping.*** When you take solar out of the equation, the take rate or transaction fee has been incredibly consistent for the last 4 years. So that is the preponderance of the delta.

(Emphasis added.)

134.     Defendant Benjamin went on to state that the Company was well aware of the

declining average transaction fee rate before the IPO, and that the Company enters each fiscal year

with "tremendous visibility" into its ability to originate new loans and attract new business.

Defendant Benjamin stated, "[t]ypically, 93%, 94% of our plan is baked."  The negative effects

that the Company's shift from solar panel would have on revenue were, therefore, known, or

should have been known, to the Individual Defendants.

### *February 26, 2019 Conference Call*

135.     On February 26, 2019, the Company participated in a conference call held as part

of the Morgan Stanley Technology, Media & Telecom Conference.  During the call, Defendant

Benjamin disclosed that "historically, when we took out the solar business, which we jettisoned . . . take rate's been incredibly stable at about 700 basis points for the last seven years*."*

### March 5, 2019 Conference Call

136.    On March 5, 2019, the Company conducted an earnings call held to discuss the Company's 2018 fourth quarter results.  Questioned by an analyst about the Company's 2019 guidance, Defendant Zalik stated, "not having the noise of solar is really great.  Because from a— on a relative basis when as much as 20% of your business at 13% transaction fee evaporates to 4% by design that will, on a relative basis, make anything look not so good."

137.    The IPO Documents, however, did not consider the solar business to be "noise," and in fact touted the Company's transaction fee performance and potential growth using old data based on solar panel transaction fees.

### *2018 10-K*

138.    On March 15, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ending December 31, 2018 (the "2018 10-K").  The 2018 10-K was signed by Defendants Zalik, Partlow, Benjamin, Babbit, Flynn, Freishtat, Morris, and Sheft.  Defendants Zalik and Partlow signed SOX certifications, attesting to the accuracy of the 2018 10-K.

139.    The 2018 10-K plainly showed that the reduced transaction fees had had a negative impact on GreenSky's financials as compared with 2017.  According to the 2018 10-K, the average transaction fee rate fell by 46 basis points from 2017 to 2018.  The 2018 10-K stated the decrease was "related to the types of loans originated on our platform," which "varies by merchant category.  Therefore, shifts in merchant mix have a direct impact on our transaction fee rates."  Overall, the Company's total cost of revenue during 2018 was over 78% higher than in 2017, while the Company's gross profits in 2018 increased only by 7.6%.

140.    The 2018 10-K stated in relevant part:

*2018 vs. 2017.* Total revenue increased during the year ended December 31, 2018 compared to 2017 primarily due to an increase in transaction fees. During the year ended December 31, 2018, transaction volume increased by 34% compared to 2017. *The impact of higher transaction volume was offset by a decrease in transaction fees earned per dollar originated to 6.94% during the year ended December 31, 2018 from 7.40% during 2017.* More recently, our transaction fee rate increased to 7.11% in the fourth quarter of 2018 from 6.91% in the third quarter of 2018. *The period over period transaction fee rate decline is related to the types of loans originated on our platform.* Loans with lower interest rates generally carry relatively higher transaction fee rates. Conversely, loans with higher interest rates generally carry relatively lower transaction fee rates. *The mix of loans offered by merchants generally varies by merchant category, and is dependent on merchant and consumer behavior. Therefore, shifts in merchant mix have a direct impact on our transaction fee rates. During the year ended December 31, 2018 relative to 2017,* there was a shift in loan originations from lower to higher annual percentage yields and *shifts in merchant mix, which resulted in the decrease in transaction fees earned per dollar originated.*

(Emphasis added).

141.    The 2018 10-K disclosed further that the transaction fee rate fell 53 basis points from 2016 to 2017 "due to similar factors as outlined in the foregoing 2018 vs. 2017 variance discussion." The 2018 10-K therefore admitted that the Company's 2017 financials had also been negatively affected by the shift away from the solar panel business.

142.    The 2018 10-K stated further in relevant part:

*2017 vs. 2016.* Total revenue increased during the year ended December 31, 2017 compared to 2016 primarily due to an increase in transaction fees. During the year ended December 31, 2017, transaction volume increased by 31% compared to 2016. The impact of higher transaction volume was offset by a decrease in transaction fees earned per dollar originated to 7.40% during the year ended December 31, 2017 from 7.93% during 2016, which was *due to similar factors as outlined in the foregoing 2018 vs. 2017 variance discussion*.

(Emphasis added.)

143.    The foregoing explanation is in stark contrast from the discussion of the differences between 2016 and 2017 in the Prospectus, where the lower transaction fee rate is attributed solely

to the Company "facilitat[ing] a larger volume of loans with higher annual percentage yields."  In other words, the Prospectus omitted that the decline in the Company's average transaction fee rate was the result of the Individual Defendants' decision to move away from the lucrative solar panel business, and that the Company's shift from solar panels was already having a negative effect on the Company's financials in 2017, months before the May 2018 IPO.

### Repurchases

144.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company due to the fact that the stock price was artificially inflated from the Individual Defendants' failure to correct the misstatements and omissions made in the IPO Documents.

145.    According to the 2Q18 10-Q, the Company purchased 2,426,198 shares of its common stock in connection with the IPO for approximately $55.8 million, at an average price of $23.00 per share.

146.    As the Company's stock was actually worth only $9.28 per share, the price at closing on November 6, 2018, the Company overpaid approximately $33.2 million for repurchases of its own stock in connection with the IPO.

### DAMAGES TO GREENSKY

147.    As a direct and proximate result of the Individual Defendants' misconduct, GreenSky has lost and will continue to lose and expend many millions of dollars.

148.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

149.     Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

150.     Such losses include the Company's overpayment by over $33.2 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

151.     As a direct and proximate result of the Individual Defendants' conduct, GreenSky has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

152.     Plaintiff brings this action derivatively and for the benefit of GreenSky to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of GreenSky, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

153.     GreenSky is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

154.     Plaintiff is, and has been since before the beginning of the Relevant Period, a shareholder of GreenSky. Plaintiff will adequately and fairly represent the interests of GreenSky in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

155.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

156.    A pre-suit demand on the Board of GreenSky is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals:  Defendants Zalik, Benjamin, Babbit, Flynn, Freishtat, Sheft (the "Director-Defendants"), and non-party Arthur Bacci ("Bacci") (collectively with the Director-Defendants, the "Directors").  Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

157.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while causing the Company to overpay by over $33.2 million for repurchases of its own stock and to cause the Company to pay them millions of dollars with, *inter alia*, the IPO proceeds, and to thereafter fail to correct, and cause the Company to fail to correct, those false and misleading statements and omissions of material facts, all of which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

158.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

159.    Additional reasons that demand on Defendant Zalik is futile follow.  Defendant Zalik is a co-founder of the Company, has served as the Company's CEO since 2006, and has served as the Chairman of the Board of Directors since at least the time of the IPO.  Thus, as the Company admits, he is a non-independent director.  Defendant Zalik's beneficial ownership of Class B common stock provides him with a combined voting power of 51.4%, rendering him a controlling shareholder.  The Company provides Defendant Zalik with his principal occupation, and he receives handsome compensation, including $502,288 in 2018 for his services.  Defendant Zalik was ultimately responsible for all of the false and misleading statements and omissions made in the IPO Documents and obtained over $468 million from the Company's purchase of Holdco Units in connection with the IPO.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Zalik is a defendant in the Securities Class Actions.  For these reasons, Defendant Zalik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Benjamin is futile follow.  Defendant Benjamin has served as the Company's Vice Chairman since 2014, as CAO since February 2018, and as a Company director since at least July 2017.  Thus, as the Company admits, he is a non-independent director.  The Company provides Defendant Benjamin with his principal occupation, and he receives handsome compensation, including $5,771,895 in 2018 for his services.  Defendant Benjamin was ultimately responsible for all of the false and misleading statements and omissions

made in the IPO Documents and obtained over $8.7 million from the Company's purchase of Holdco Units in connection with the IPO.  As one of the Company's highest officers and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Benjamin is a defendant in the Securities Class Actions.  For these reasons, Defendant Benjamin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand on Defendant Babbit is futile follow.  Defendant Babbit has served as a Company director since 2015, and he is the Chairman of the Governance and Nominating Committee and a member of the Compensation Committee.  Defendant Babbit receives handsome compensation, including $547,258 in 2018 for his services, which excessive compensation renders him non-independent.  Defendant Babbit was ultimately responsible for all of the false and misleading statements and omissions made in the IPO Documents and obtained over $77 thousand from the Company's purchase of Holdco Units in connection with the IPO.  As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Babbit is a defendant in the Securities Class Actions.  For these reasons, Defendant Babbit breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Flynn is futile follow. Defendant Flynn has served as a Company director since April 2018, and he is the Chairman of the Audit Committee and a member of the Compensation Committee. Defendant Flynn was ultimately responsible for all of the false and misleading statements and omissions made in the IPO Documents. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Flynn is a defendant in the Securities Class Actions. For these reasons, Defendant Flynn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Freishtat is futile follow. Defendant Freishtat has served as a Company director since 2014, and he is a member of the Compensation Committee and the Governance and Nominating Committee. Defendant Freishtat receives handsome compensation, including $552,469 in 2018 for his services, which excessive compensation renders him non-independent. Defendant Freishtat was ultimately responsible for all of the false and misleading statements and omissions made in the IPO Documents and obtained over $98 thousand from the Company's purchase of Holdco Units in connection with the IPO. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Freishtat is a defendant in the Securities Class Actions. For these reasons, Defendant Freishtat breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.     Additional reasons that demand on Defendant Sheft is futile follow.  Defendant Sheft has served as a Company director since 2014, and he is a member of the Audit Committee and the Governance and Nominating Committee.  Defendant Sheft was ultimately responsible for all of the false and misleading statements and omissions made in the IPO Documents and obtained over $4.8 million from the Company's purchase of Holdco Units in connection with the IPO.  As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant Sheft is a defendant in the Securities Class Actions. For these reasons, Defendant Sheft breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.     Additional reasons that demand on the Board is futile follow.

166.     Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action and in the Securities Class Actions, are beholden to and controlled by Defendant Zalik, who controls the Company by virtue of his share ownership, which provided him with approximately 51.4% of total shareholder voting power as of April 8, 2019. These shareholdings provide Defendant Zalik with significant control over the continued employment of the Director-Defendants.   In light of Defendant Zalik's control, Defendant Benjamin, whose employment with the Company provides him with his principal source of income, and Defendants Babbit and Freishtat, who receive unusually high compensation given

their roles as non-employee directors, are especially not disinterested. Thus, the Director-Defendants are unable to evaluate a demand with disinterest or independence as a result of Defendant Zalik's control over them.

167. As described herein, many of the Director-Defendants have been and continue to be involved in highly lucrative related party transactions with the Company. These transactions include the Tax Receivable Agreement, which will require the Company to pay hundreds of millions of dollars to Defendants Zalik, Benjamin, Babbit, Freishtat, Sheft, and other pre-IPO investors over the next 15 years, as well as the Company's use of IPO proceeds to purchase Holdco Units from Defendants Zalik, Benjamin, Babbit, Freishtat, Sheft, and other investors, for which most of them received millions of dollars. In light of these lucrative transactions with the Company, Defendants Zalik, Benjamin, Babbit, Freishtat, and Sheft are not independent or disinterested, and thus demand upon them would be futile.

168. An additional reason that Defendant Zalik is not independent is that the Company currently maintains a lease agreement with a company owned by Defendant Zalik for 82,400 square feet of office space, for which the Company has paid approximately $2.1 million as of March 31, 2019.

169. Additionally, the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $33.2 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face

a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

170.    The Director-Defendants have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, demand upon the Director-Defendants would be futile.

171.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements and fail to correct them, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.  In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

172.    GreenSky has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for GreenSky any part of the damages GreenSky suffered and will continue to suffer thereby.  Thus, any demand upon the Director-Defendants would be futile.

173.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand on the Board is excused as being futile.

174.    The acts complained of herein constitute violations of fiduciary duties owed by GreenSky's officers, directors, and/or controlling shareholders, and these acts are incapable of ratification.

175.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of GreenSky.  If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of GreenSky, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

176.    If there is no directors' and officers' liability insurance, then the Directors will not cause GreenSky to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

177.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding GreenSky.  Not only is GreenSky now defending claims that it violated Sections 11, 12(a)(2), and 15 of the Securities Act, but the Company itself is also a victim of violations of Section 10(b) of the Exchange Act and the unlawful scheme perpetrated upon GreenSky by the Individual Defendants.  With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 2,426,198 of its own shares, damaging GreenSky.

180.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

181.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices

and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about GreenSky not misleading.

182. The Individual Defendants, as top executives, directors, and/or controlling shareholders of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors, officers, and/or controlling shareholders of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by GreenSky.

183. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company or received briefings from them, and they were, therefore, directly responsible for the schemes set forth herein and for the false and misleading statements and omissions disseminated to the public through filings with the SEC.

184. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

185. Plaintiff on behalf of GreenSky has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

186. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants, by virtue of their positions with GreenSky and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of GreenSky and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause GreenSky and the other Individual Defendants to engage in the illegal conduct and practices complained of herein.

188.    Plaintiff, on behalf of GreenSky, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GreenSky's business and affairs.

191.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

192.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GreenSky.

193.    In breach of their fiduciary duties owed to GreenSky, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:  (1) at the time of the IPO, GreenSky was transitioning away from its lucrative solar panel loan business, in favor of the much

less profitable elective healthcare loan business; (2) this transition involved material risks and resulted in declining transaction fee rates, as a significant percentage of the Company's transaction fees were obtained from its solar panel merchants; (3) the shift in the merchant mix from solar panel to elective health care was already having a negative impact on the Company's revenue and growth prospects; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, GreenSky's public statements were materially false and misleading at all relevant times.

194.    The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

195.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

196.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of GreenSky's securities.

197.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of GreenSky's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

198. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GreenSky has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200. Plaintiff on behalf of GreenSky has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

201. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GreenSky.

203. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GreenSky that was tied to the performance or artificially inflated valuation of GreenSky, or received compensation or other payments, including payments made in connection with the Tax Receivable Agreement and the Company's purchase of Holdco Units from the Individual Defendants, that were unjust in light of the Individual Defendants' bad faith conduct.

204.    Plaintiff, as a shareholder and a representative of GreenSky, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

205.    Plaintiff on behalf of GreenSky has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence GreenSky, for which they are legally responsible.

208.    As a direct and proximate result of the Individual Defendants' abuse of control, GreenSky has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, GreenSky has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff on behalf of GreenSky has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of GreenSky in a manner consistent with the operations of a publicly-held corporation.

212.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GreenSky has sustained and will continue to sustain significant damages.

213.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff on behalf of GreenSky has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    The Individual Defendants caused the Company to waste corporate assets by paying themselves, to the detriment of the shareholders and the Company, excessive salaries and fees and payments made in connection with the Tax Receivable Agreement and the Company's purchase of Holdco Units from the Individual Defendants.

217.    The Individual Defendants caused the Company to waste corporate assets by repurchasing the Company's own stock at artificially inflated prices.

218.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused GreenSky to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

219.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

220.    Plaintiff on behalf of GreenSky has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of GreenSky, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have violated the Exchange Act and breached and/or aided and abetted the breach of their fiduciary duties to GreenSky;

(c)     Determining and awarding to GreenSky the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing GreenSky and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GreenSky and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of GreenSky to nominate at least four

candidates for election to the Board; and

   3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

   (e) Awarding GreenSky restitution from Individual Defendants, and each of them;

   (f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

   (g) Granting such other and further relief as the Court may deem just and proper.

Dated: March 31, 2020     Respectfully submitted,

Of Counsel:       **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**  /s/ Michael J. Farnan
Phillip Kim        Brian E. Farnan (Bar No. 4089)
275 Madison Avenue, 34th Floor  Michael J. Farnan (Bar No. 5165)
New York, NY 10016    919 N. Market St., 12th Floor
Telephone: (212) 686-1060   Wilmington, DE 19801
Facsimile: (212) 202-3827    Telephone: (302) 777-0300
Email: pkim@rosenlegal.com   Facsimile: (302) 777-0301
           Email: bfarnan@farnanlaw.com
           Email: mfarnan@farnanlaw.com
**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

           *Attorneys for Plaintiff*